**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| CHASE BANK USA, N.A., | : |
| | : |
| Plaintiff, | : |
| | : |
| v. | : |
| | : |
| HESS KENNEDY CHARTERED, LLC, | : |
| LAURA L. HESS, EDWARD T. KENNEDY, | :     Civil Action No. 08-121-JJF |
| LAURA HESS & ASSOCIATES, P.A., | : |
| HESS KENNEDY HOLDINGS, LTD., | : |
| HESS KENNEDY COMPANY CHARTERED | : |
| BWI, THE CONSUMER LAW CENTER, LLC, | : |
| THE CONSUMER LAW CENTER OF DELRAY | : |
| BEACH, LLC, THE CONSUMER LAW | : |
| CENTER OF BOCA RATON, INC., THE | : |
| CAMPOS CHARTERED LAW FIRM, JEFF | : |
| CAMPOS, P.A., JEFFREY S. CAMPOS, LEGAL | : |
| DEBT CENTER, LLC, | : |
| | : |
| Defendants. | : |

## MOTION OF PLAINTIFF CHASE BANK USA, N.A.
## TO STRIKE DEFENDANTS' MAY 5 MEMORANDUM

Plaintiff Chase Bank USA, N.A.("Chase"), by and through its undersigned

counsel, respectfully moves this Honorable Court to strike defendants' May 5, 2008

memorandum and award Chase the costs of this motion. In support of its Motion, Chase

incorporates herein by reference the attached Memorandum of Law.

Dated: June 6, 2008

Respectfully submitted,

Beth Moskow-Schnoll (No. 2900)
BALLARD SPAHR ANDREWS
  & INGERSOLL, LLP
919 N. Market Street, 12th Floor
Wilmington, DE 19801
Telephone: (302) 252-4465
Facsimile: (302) 252-4466
Email: moskowschnollb@ballardspahr.com

Attorneys for Plaintiff
Chase Bank USA, N.A.

OF COUNSEL:

David H. Pittinsky, Esquire
Alan S. Kaplinsky, Esquire
Mark J. Levin, Esquire
BALLARD SPAHR ANDREWS
  & INGERSOLL, LLP
1735 Market Street, 51st Floor
Philadelphia, PA  19103
(215) 665-8500

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

CHASE BANK USA, N.A.,                          :
                                               :
    Plaintiff,                                  :
                                               :
    v.                                          :
                                               :
HESS KENNEDY CHARTERED, LLC,                   :
LAURA L. HESS, EDWARD T. KENNEDY,              :     Civil Action No. 08-121-JJF
LAURA HESS & ASSOCIATES, P.A.,                 :
HESS KENNEDY HOLDINGS, LTD.,                   :
HESS KENNEDY COMPANY CHARTERED                 :
BWI, THE CONSUMER LAW CENTER, LLC,             :
THE CONSUMER LAW CENTER OF DELRAY              :
BEACH, LLC, THE CONSUMER LAW                   :
CENTER OF BOCA RATON, INC., THE                :
CAMPOS CHARTERED LAW FIRM, JEFF                :
CAMPOS, P.A., JEFFREY S. CAMPOS, LEGAL         :
DEBT CENTER, LLC,                              :
                                               :
    Defendants.                                 :
                                               :

## PLAINTIFF CHASE BANK USA, N.A.'S MEMORANDUM OF LAW IN SUPPORT OF MOTION TO STRIKE DEFENDANTS' MAY 5, 2008 MEMORANDUM

        Plaintiff Chase Bank USA, N.A. ("Chase"), by its undersigned counsel,

respectfully submits this memorandum of law in support of its motion to strike the memorandum

filed by certain of the defendants in this action on May 5, 2008.

        By way of background, Chase filed its Complaint on February 29, 2008. On

April 1, 2008, certain of the defendants (the "moving defendants") filed a motion to dismiss the

Complaint for lack of personal jurisdiction or, in the alternative, to transfer to the Southern

District of Florida. On April 18, 2008, Chase filed a response to the moving defendants' motion.

On April 25, 2008, the moving defendants filed a reply to Chase's response.

        In their April 25 reply, the moving defendants asserted that their "only office

presently conducting business is the Coral Springs, Florida office," that "at the present time,

Defendants are only operating a single office in Coral Springs, Florida and in no other state" and that "now, at the present time, only the office in Coral Springs, Florida is still in operation."

On May 1, 2008, Chase filed a motion for leave to file a sur-reply (a copy of which was attached to the motion) on the ground that the moving defendants' April 25 reply contained sworn statements that were highly questionable, at best, and at worst perjurious. In particular, the sur-reply advised the Court that, on March 10, 2008, moving defendant Laura Hess had filed a "Response to Order to Show Cause" with the Supreme Court of Florida stating that she "is the sole Florida partner of a **multi-state** and **multi-national** law firm known as Hess Kennedy. The law firm maintains offices in New York, California, and the Cayman Islands and has a substantial presence in Coral Springs, Florida." (Emphasis added). Chase also submitted documentary evidence that, as of March 7, 2008, Hess Kennedy was using a letterhead that listed offices not only in Florida, but also in New York, Illinois, California, the Cayman Islands and Singapore.

Chase argued in its sur-reply that, unless there had been a drastic change in the status of Hess Kennedy between March 10, 2008 and April 25, 2008 (the date the moving defendants filed their reply), Ms. Hess' March 10 admission completely contradicted the repeated statements in the reply that the moving defendants' only office presently conducting business is the Coral Springs, Florida office.

On May 5, 2008, the moving defendants filed a memorandum opposing Chase's motion for leave to file a sur-reply. On page 2 of that memorandum, the moving defendants accused Chase of "misleading" the Court in its sur-reply and further stated:

> "[I]t is incredibly disingenuous for the Plaintiff to take such a position because the Plaintiff fails to advise this court that the court filing it is relying upon as the basis for its request for a sur-reply (i.e. a filing in a Florida bar action) is not accurate in that the

Plaintiff fails to advise this Court that **said filing was thereafter clarified to indicate that in fact the Defendants do not have offices outside the State of Florida**. Hence, the actual record, if the Plaintiff had made the effort to make sure its representation was accurate, is in fact supportive of the Defendants' position.

For the Plaintiff to use an incomplete document and mislead the Court without then advising the Court that **the filing was actually clarified** and thereby the complete record actually supports the Defendants is tantamount to hiding evidence from this Court and greatly questions the integrity of the filings by the Plaintiff."

(Emphasis added). Significantly, the moving defendants did **not** attach to their May 5 memorandum the alleged "clarifying" document referred to in the memorandum.

On May 21, 2008, counsel for Chase wrote counsel for the moving defendants and demanded that he immediately send Chase a copy of the clarifying document referred to in the May 5 memorandum. Chase stated that it had reviewed the Supreme Court of Florida docket in question and had found no such clarification to Hess' March 10, 2008 representations about Hess Kennedy's office locations. (May 21, 2008 letter, Exhibit A hereto).

On May 28, 2008, in a telephone discussion with Chase's counsel, counsel for the moving defendants acknowledged that he did **not** have any such clarification in hand and that, if he did not receive it promptly from his clients (the moving defendants), he would withdraw his May 5 memorandum.

On June 3, 2008, counsel for Chase sent a letter to counsel for the moving defendants which memorialized the May 28 telephone discussion and stated that, since counsel for the moving defendants still had not provided the alleged clarification, Chase was requesting that he immediately withdraw the May 5 memorandum or else it would be necessary for Chase to file a brief which would explain to the Court: (1) that at the time counsel for the moving defendants filed his memorandum alleging that Chase was misleading the Court, he did not have

the document upon which he relied for attacking Chase; and (2) he was unable to provide the document to Chase even after Chase requested it. (June 3, 2008 Chase letter, Exhibit B hereto).

On June 3, 2008, counsel for the moving defendants sent Chase a letter acknowledging that he still had **not** obtained any clarifying document from his clients and that Chase "may file what [it] wish[es], when [it] wish[es]." Although counsel for the moving defendants further acknowledged that "I did indicate that, if we made a false statement, we would see it was rectified," he offered no assurance of when, if ever, that would take place. (June 3, 2008 moving defendants letter, Exhibit C hereto). On June 4, 2008, counsel for the moving defendants sent Chase an email stating, "Attached is the transcript of the testimony of Laura Hess on May 16, **2008**, which is the document referred to in our recent pleading." (June 4, 2008 email, Exhibit D hereto). Attached to the email was the transcript of the sworn statement of Laura Hess taken by the Florida Bar on May 16, **2007,** not 2008 as stated in the email. While counsel for the moving defendants may claim that this is the purported clarification to which they referred in their May 5 memorandum, such a claim is, at best, disingenuous for several reasons. First, Ms. Hess' statement that was allegedly later clarified was not filed until March 10, **2008**. How can a transcript dated ten months **earlier** clarify a later filing? Second, Ms. Hess' statement was filed in her own disciplinary proceedings occurring before the Florida Supreme Court. This earlier sworn statement, however, was taken in connection with the separate unlicensed practice of law investigation of Walter Chen. (May 16, 2007 transcript, Exhibit D hereto). Third, as of June 3, 2008, the dockets of Hess' Florida Supreme Court matters still do not reflect any "clarification" by the moving defendants, and there is **no** indication the transcript of Hess' statement from the Chen investigation has been filed in Hess' own disciplinary actions. (Docket sheets, Exhibit E hereto).

Finally, and most importantly, this "clarification" does not support the moving defendants' position. On the contrary, the transcript directly contradicts their assertion that the moving defendants maintain offices only in Florida. When asked where, in addition to Coral Springs, Florida, Hess Kennedy Chartered had offices, Ms. Hess replied, "We have one in London. We have one in Singapore.... We have one in the Cayman Islands. We have one in South Carolina, Chicago and the Florida ones I mentioned. . . California, New York and New Jersey." (May 16, 2007 transcript, p. 21, Exhibit D hereto). Thus, once again, Ms. Hess swears that Hess Kennedy Chartered is a multi-state and multi-national law firm, just as Chase asserted in its filings which have been contested by the moving defendants.

Accordingly, Chase moves to strike the moving defendants' May 5, 2008 memorandum. That memorandum accused Chase of misleading the Court because it did not disclose that the moving defendants had clarified the March 10, 2008 statement by Laura Hess to the Florida Supreme Court upon which Chase was relying. However, the moving defendants did not attach any such clarifying document to their May 5 memorandum, and the alleged "clarifying" document that they have now produced -- only after Chase's repeated demands during the month that has elapsed since they filed their May 5 memorandum -- directly contradicts the assertions contained in their May 5 memorandum. Thus, there was and is no basis for the moving defendants to accuse Chase of misleading the Court. In fact, if anyone has misled this Court it is the moving defendants.

Under these circumstances, Chase respectfully submits that the moving defendants' May 5 memorandum should be stricken and Chase should be awarded the costs of this motion. As stated in Mount Sinai Hospital v. Borg-Warner Corp., 527 F. Supp. 922, 926-27 (S.D.N.Y. 1981):

> The Court notes the various references in defendant's brief in opposition to plaintiffs' motion. It contains an intemperate attack upon the integrity of plaintiffs' attorney based upon his failure to request interest or an instruction with respect thereto. The charge that plaintiffs' attorney was engaged in a "sneak" attack by deliberately waiting until after the entry of judgment, compounded by charging him with indulging in "dishonest practice" is not only unfair but utterly without justification. While Federal Rule of Civil Procedure 12(f) authorizes the court on its own motion to order stricken "any pleading" that contains "impertinent, or scandalous matter," the Court is of the view that it encompasses briefs, affidavits or any document submitted to the Court. In any event, the Court has inherent power to strike any scandalous matter or document submitted to it. The Court orders the defendant's brief stricken from the files.

See also Davis v. Norris, 34 Fed. Appx. 658, 663 (10th Cir. 2002) (court has inherent power to impose sanctions and assess payment of attorneys' fees to deter frivolous filings); Christensen v. Ward, 916 F.2d 1462, 1469 (10th Cir. 1990) (federal court has inherent power to impose sanctions including costs and attorneys' fees that are necessary to regulate the docket and promote judicial efficiency); Kitson v. Bank of Edwardsville, 240 F.R.D. 610, 611 (S.D. Ill. 2006) ("the Court has of course the inherent power to strike submissions to the Court other than pleadings") (citing cases); 28 U.S.C. § 1927 ("[a]ny attorney or other person admitted to conduct cases in any court of the United States or any Territory thereof who so multiplies the proceedings in any case unreasonably and vexatiously may be required by the court to satisfy personally the excess costs, expenses, and attorneys' fees reasonably incurred because of such conduct).

For all of the foregoing reasons, plaintiff Chase Bank USA, N.A. respectfully requests that this Court strike the moving defendants' May 5, 2008 memorandum in this action and award Chase the costs, including attorneys' fees, of this motion.

Respectfully submitted,

Dated: June 6, 2008

Beth Moskow-Schnoll (No. 2900)
BALLARD SPAHR ANDREWS
  & INGERSOLL, LLP
919 N. Market Street, 12th Floor
Wilmington, DE 19801
Telephone: (302) 252-4465
Facsimile: (302) 252-4466
Email: moskowschnollb@ballardspahr.com

Attorneys for Plaintiff
Chase Bank USA, N.A.

OF COUNSEL:

David H. Pittinsky, Esquire
Alan S. Kaplinsky, Esquire
Mark J. Levin, Esquire
BALLARD SPAHR ANDREWS
  & INGERSOLL, LLP
1735 Market Street, 51st Floor
Philadelphia, PA  19103
(215) 665-8500

# EXHIBIT A

LAW OFFICES

# BALLARD SPAHR ANDREWS & INGERSOLL, LLP

919 NORTH MARKET STREET, 12TH FLOOR
WILMINGTON, DELAWARE 19801-3034
(302) 252-4465
FAX: (302) 252-4466
WWW.BALLARDSPAHR.COM

PHILADELPHIA, PA
BALTIMORE, MD
BETHESDA, MD
DENVER, CO
LAS VEGAS, NV
LOS ANGELES, CA
PHOENIX, AZ
SALT LAKE CITY, UT
VOORHEES, NJ
WASHINGTON, DC

BETH MOSKOW-SCHNOLL
DIRECT DIAL: 302-252-4447
PERSONAL FAX: 302-355-0221
MOSKOWSCHNOLL@BALLARDSPAHR.COM

May 21, 2008

**By Hand Delivery**

Robert K. Beste, Jr.
Cohen Seglias Pallas Greenhall & Furman P.C.
Nemours Building, Suite 1130
1007 North Orange Street
Wilmington, DE 19801

Re:    **Chase Bank USA, N.A. v. Hess Kennedy Chartered, LLC, et al.**
       **Civil Action No. 08-121-JJF**

Dear Mr. Beste:

In our Sur-Reply dated May 1, 2008, we stated that on March 10, 2008, Laura Hess had filed a "Response to Order to Show Cause" with the Supreme Court of Florida claiming that she "is the sole Florida partner of a multi-state and multi-national law firm known as Hess Kennedy." In your Memorandum in Opposition to the Plaintiff's Request to File a Sur-Reply dated May 5, 2008, you wrote that this statement was not accurate because "the Plaintiff fails to advise this Court that said filing was thereafter clarified to indicate that in fact the Defendants do not have offices outside the State of Florida." You went on to state that our alleged failure to mention this clarification which was a part of the public record constituted an attempt to mislead the court.

A copy of this alleged clarification was not attached to your filing, and a review of the docket in Hess' matter before the Supreme Court of Florida reveals no such filing. Therefore, we request that you immediately send us a copy of the document to which you referred in your Memorandum in Opposition to the Plaintiff's Request to File a Sur-Reply.

Very truly yours,

Beth Moskow-Schnoll

BMS/

# EXHIBIT B

LAW OFFICES
## BALLARD SPAHR ANDREWS & INGERSOLL, LLP
919 NORTH MARKET STREET 12TH FLOOR
WILMINGTON, DELAWARE 19801-3034
302-252-4465
FAX: 302-252-4466
WWW.BALLARDSPAHR.COM

PHILADELPHIA, PA
BALTIMORE, MD
BETHESDA, MD
DENVER, CO
LAS VEGAS, NV
LOS ANGELES, CA
PHOENIX, AZ
SALT LAKE CITY, UT
VOORHEES, NJ
WASHINGTON, DC

June 3, 2008

**By Hand Delivery**

Robert K. Beste, Jr.
Cohen Seglias Pallas Greenhall & Furman P.C.
Nemours Building, Suite 1130
1007 North Orange Street
Wilmington, DE 19801

Re:    **Chase Bank USA, N.A. v. Hess Kennedy Chartered, LLC, et al.**
       **Civil Action No. 08-121-JJF**

Dear Mr. Beste:

In a letter dated May 21, 2008, we requested that you immediately send us a copy of the alleged clarification to which you referred in your Memorandum in Opposition to the Plaintiff's Request to File a Sur-Reply dated May 5, 2008. In a telephone conversation on May 28, 2008, you acknowledged that you did not have any such clarification in hand, and that if you did not receive it promptly, you would withdraw your Memorandum in Opposition to the Plaintiff's Request to File a Sur-Reply. As several days have gone by since that conversation with no clarification having been forthcoming, we ask that you immediately withdraw your May 5, 2008 filing. Failure to file the withdrawal by close of business tomorrow, June 4, 2008, will necessitate our filing of a brief which will explain to the court that: (1) at the time you filed your memorandum alleging that we were misleading the court, you did not have the document upon which you relied for attacking us; and (2) that you were unable to provide the document to us even after we requested it.

Very truly yours,

Beth Moskow-Schnoll

BMS/

# EXHIBIT C



COHEN SEGLIAS PALLAS GREENHALL &FURMAN PC

Robert K. Beste, Jr.
Attorney At Law

Nemours Building, Suite 1130
1007 Orange Street
Wilmington, DE 19801
T: 302.425.5089 | F: 302.425.5097
rbeste@cohenseglias.com
www.cohenseglias.com

June 3, 2008

**By Facsimile to 252-4466 and**
**First-Class Mail**
Beth Moskow-Schnoll, Esquire
Ballard Spahr Andrews & Ingersoll, LLP
919 N. Market Street, 12th Floor
Wilmington, DE 19801

RE:     Chase Bank, USA, N.A. v. Hess Kennedy Chartered, LLC, et al.
        C. A. No. 08-121-JJF

Dear Beth:

I am in receipt of your letter dated June 3, 2008, which I received earlier today.

When we spoke on May 28, 2008, I indicated to you that I would indeed seek some documentation to support the clarification you sought. I did not indicate I would withdraw our Memorandum in Opposition to Plaintiff's Request to File a Sur-Reply. I did indicate that, if we made a false statement, we would see it was rectified.

You, of course, may file what you wish, when you wish. I can tell you it has been rather difficult to work with everyone's schedules in the past week or so, and we are continuing our efforts to obtain the clarification you seek.

Very truly yours,

ROBERT K. BESTE, JR.

RKB/msj
22308-01; Doc. 20

# EXHIBIT D

**Moskow-Schnoll, Beth (Wilm)**

| | |
|---|---|
| **From:** | Robert K. Beste [rbeste@cohenseglias.com] |
| **Sent:** | Wednesday, June 04, 2008 2:43 PM |
| **To:** | moscowschnoll@ballardspahr.com |
| **Subject:** | Chase Bank v. Hess Kennedy |

**Attachments:**    Laura Hess Depo.pdf



Laura Hess
epo.pdf (1,021 KB).

Beth:

        Attached is the transcript of the testimony of Laura Hess on May 16, 2008, which is
the document referred to in our recent pleading.

Bob

Robert K. Beste, Jr.
Cohen Seglias Pallas Greenhall and Furman, P.C.
Suite 1130, Nemours Building
1007 Orange Street
Wilmington, Delaware 19801
Tel. 302-425-5089
Fax. 302-425-5097
E-Mail. Rbeste@cohenseglias.com


IRS Circular 230 Notice: To ensure compliance with certain regulations promulgated by the
U.S. Internal Revenue Service, we inform you that any federal tax advice contained in this
communication (including any
attachments) is not intended or written to be used, and cannot be used, by any taxpayer
for the purpose of (1) avoiding tax-related penalties under the U.S. Internal Revenue
Code, or (2) promoting, marketing or recommending to another party any tax-related matters
addressed herein, unless expressly stated otherwise



***CONFIDENTIALITY NOTICE****

This E-Mail message and any documents accompanying this E-Mail transmission contain
information from the law firm of  Cohen Seglias Pallas Greenhall & Furman PC which is
"Privileged and confidential attorney-client communication and/or work product of
counsel." If you are not the intended recipient, you are hereby notified that any
disclosure, copying, distribution and/or the taking of or refraining from taking of any
action in reliance on the contents of this E-Mail information is strictly prohibited and
may result in legal action being instituted against you. Please reply to the sender
advising of the error in transmission and delete the message and any accompanying
documents from your system immediately. Thank




 This file was created using eCopy Desktop. For information about how you can eCopy paper
documents, visit www.ecopy.com. To view .cpy files, download the evaluation version of
eCopy Desktop at www.ecopy.com/products/desktop_eval.asp

IN THE SUPREME COURT OF FLORIDA
(Before a Referee)

THE FLORIDA BAR FILE NOS.   20071030(17C) and
20071034(17C)


In Re:

Unlicensed Practice of Law
Investigation of Walter Chen.



_____/



Fort Lauderdale, Florida
Wednesday, May 16, 2007
4:24 p.m. - 5:33 p.m.
Before Pilar A. Stenzel, R.P.R.,
Notary Public, State of Florida




- - -



SWORN STATEMENT OF THE WITNESS
LAURA LYNN HESS
TAKEN BY THE FLORIDA BAR



- - -



UPL
PUBLIC RECORD

<u>A P P E A R A N C E S:</u>


Bar Counsel:

    Janet Bradford Morgan, Esquire
    Juan Carlos Arias, Esquire

Counsel to Ms. Hess:

    Kevin P. Tynan, Esquire

UPL Committee Members:

    Mr. Haas A. Hatic, Esquire, Chair
    Mr. Mark R. Dissette, nonlawyer
    Mr. Mark Fravel, nonlawyer
    Mr. Gino Martone, nonlawyer

UPL
PUBLIC RECORD

I N D E X

<table>
<tr><td></td><td>DIRECT</td><td>CROSS</td><td>RE-<br>DIRECT</td><td>RE-<br>CROSS</td></tr>
</table>

WITNESS:

LAURA LYNN HESS

By Ms. Morgan ........ 6

E X H I B I T S:

<table>
<tr><td></td><td>Identified</td><td>Marked</td></tr>
<tr><td>Florida Bar's No. 1</td><td>.......... 50</td><td>71</td></tr>
<tr><td>Florida Bar's No. 2</td><td>.......... 55</td><td>71</td></tr>
<tr><td>Florida Bar's No. 3</td><td>.......... 57</td><td>71</td></tr>
<tr><td>Florida Bar's No. 4</td><td>.......... 60</td><td>71</td></tr>
<tr><td>Florida Bar's No. 5</td><td>.......... 62</td><td>71</td></tr>
<tr><td>Florida Bar's No. 6</td><td>.......... 65</td><td>71</td></tr>
</table>

UPL
PUBLIC RECORD

4

# P R O C E E D I N G S

MS. MORGAN: Good afternoon.  My name
is Janet Morgan.  I'm an attorney in the
Unlicensed Practice of Law Department of The
Florida Bar.  This is the meeting of
Unlicensed Practice of Law Circuit Committee
17C.

We're here today on an investigation of
Walter Chen and several other individuals for
unlicensed practice of law.  And we have
present here today by subpoena Laura Hess and
her attorney, Kevin Tynan.

MS. Hess, I'm going to have you state
your full name and let the court reporter
swear you in.

MS. HESS:  I'm Laura Lynn Hess.
THEREUPON,

LAURA LYNN HESS,
called as a witness and being by the Reporter
first duly sworn, testified as follows:

THE WITNESS:  I do.

MS. MORGAN:  I'm going to let the
committee members go around the table and
introduce themselves.  We also have at the

5

1    end of the table bar counsel, Juan Carlos

2    Arias, from the lawyer regulation side of

3    things.  He'll be sitting in for at least

4    part of the statement.

5         We'll start with Mark.

6         MR. FRAVEL:  Mark Fravel, nonlawyer.

7         MR. DISSETTE:  Mark Dissette,

8    nonlawyer.

9         MR. HATIC:  Haas Hatic, chairman of the

10   committee.

11        MR. MARTONE:  Gino Martone, nonlawyer.

12        MS. MORGAN:  Mr. Tynan, would you like

13   to introduce yourself for the record?

14        MR. TYNAN:  And Kevin Tynan on behalf

15   of the witness.

16        MS. MORGAN:  Thank you.

17        Ms. Hess, this UPL committee has chosen

18   today to take your sworn testimony in an

19   unlicensed practice of law investigation as a

20   witness.  The investigation is pursuant to

21   the rules regulating The Florida Bar.

22        The committee is not bound by the rules

23   of evidence.  We may require you to testify

24   and produce evidence, unless you claim a

25   privilege or right duly applicable under

1          federal and state law.

2                You may have counsel present with you

3          at the statement.  And you do have your

4          counsel present who's introduced himself on

5          the record.

6                If you refuse to testify pursuant to

7          the duly-issued subpoena without a valid

8          privilege or right, you may be found in

9          contempt of court.  You've already stated

10         your full name for us.

11                      DIRECT EXAMINATION

12         Q.     (BY MS. MORGAN)  Could you please give

13   me your date of birth.

14         A.     March 21st, 1972.

15         Q.     And what is your address?

16         A.     My address is 9447 Satinleaf, Parkland,

17   Florida 33076.

18         Q.     Thank you.  As I mentioned briefly

19   before, The Florida Bar has received complaints

20   against individuals who are not members of The

21   Florida Bar resulting in an unlicensed practice

22   of law investigation.  The complaints involved

23   Hess Kennedy and Company.

24                And in the course of investigating

25   this, we have learned that you are associated

7

1    with Hess Kennedy Company or Hess Kennedy and

2    Company.   Therefore, the committee has

3    subpoenaed you here to answer questions as a

4    witness today.

5          A.      Sure.

6          Q.      Are you a resident of Florida?

7                  THE WITNESS:   Yes.

8          Q.      And you live here full time?

9          A.      Yes.

10          Q.      Are you licensed to practice law in any

11    state other than Florida?

12          A.      No.

13          Q.      And as I know and the members of the

14    committee know, you are licensed to practice in

15    Florida?

16          A.      Correct.

17          Q.      What year were you admitted to The Bar?

18          A.      July 5th, 2000.

19          Q.      All right.   What is the name of your

20    law firm?

21          A.      Hess Kennedy Company, Chartered.

22          Q.      And is that the name that the law firm

23    operates under?

24          A.      Yes.

25          Q.      Okay.   Was there an and between Kennedy

8

1    and company?  Was it Hess Kennedy Company,

2    Chartered; is that correct?

3        A.    Hess Kennedy, correct.

4        Q.    Okay.  And is this law firm registered

5    in Florida with the Division of Corporations

6    under that name?

7        A.    Yes.

8        Q.    What type of entity is it registered as

9    with the Division of Corporations?

10       A.    Registered as -- we're an international

11   law firm.

12       Q.    Okay.  And is it a corporation or a

13   partnership or --

14       A.    Yes, I believe -- and I'm not the one

15   that registered it.  I believe it's registered as

16   a company.

17       Q.    Okay.  And when was Hess Kennedy

18   Company, Chartered established?

19       A.    Well, initially it was established

20   between Mr. Kennedy and myself, I believe, back

21   in 2004.  And it was -- Mr. Kennedy went ahead

22   and expanded it a little bit more to become an

23   international law firm.  And it's just since

24   then, since the bankruptcy code's been amended,

25   continued to grow since 2005.

1        Q.    Okay.  Has this firm ever operated

2    under another name?  Since 2004, has this been

3    the name of the firm?

4        A.    No.  Before, it was, I believe, without

5    the chartered.

6        Q.    Have you ever been a partner in another

7    law firm?

8        A.    No.

9        Q.    Are you a partner in this law firm?

10       A.    Yes.

11       Q.    Have you ever been employed by another

12   law firm?

13       A.    Yes.

14       Q.    And what was that?

15       A.    Ruden, McClosky, Smith, Schuster and

16   Russell.

17       Q.    And when were you employed by them?

18       A.    '99 through 2000.

19       Q.    Okay.

20       A.    Trip Scott.  I was there for a few

21   months.  And then I opened my own private

22   practice, Laura Hess, Attorney at Law, which I

23   currently operate under.  And I also did some

24   work with Joyce Julian for, I would say,

25   approximately a year.

10

1    Q.    When you say --

2    A.    As an associate.

3    Q.    As an associate with Joyce Julian.

4    A.    Correct.

5    Q.    Okay.  When you say you operate Laura

6  Hess, Attorney at Law, is that also operating

7  presently at the same time as Hess Kennedy

8  Company, Chartered.

9    A.    Correct.  I'm operating -- I'm a

10 noncompensated director as far as my relationship

11 with Hess Kennedy.  I operate Laura Hess,

12 Attorney at Law, which is more or less an

13 independent contractor relationship.

14   Q.    Okay.  Are they located at the same

15 address?

16   A.    Yes.

17   Q.    Okay.  And what is address where Hess

18 Kennedy Company, Chartered is located?

19   A.    210 North University Drive, Suite 209,

20 Coral Springs, 33071.

21   Q.    Okay.  You know, what I think I'd like

22 to do is -- just so that I understand -- that

23 actually clears up a couple of things, what you

24 just said.

25        But these are just printouts from the

1    Secretary of State's Office.  I have not marked

2    these as exhibits, because they are printouts

3    from the Secretary of State's Office.  But just

4    to help me go through these -- I've got extra

5    copies here.

6              This one is for Hess Kennedy Company,

7    Chartered.  I have an extra copy there.  Is this

8    the law firm that you're describing?

9         A.    Yes.

10        Q.    Is this the law firm that you're

11   presently operating?

12        A.    Yes.

13        Q.    Hess Kennedy Company, Chartered, at the

14   address you just gave us.  And you're listed as

15   the only director, correct?

16        A.    Uh-huh.

17        Q.    All right.  There's another entity -- I

18   hand you copies -- that's registered with the

19   Florida Department of State called, Laura Hess,

20   Inc.  What is Laura Hess, Inc.?

21        A.    Laura Hess, Attorney at Law operates

22   under Laura Hess, Inc..

23        Q.    That is your law firm?

24        A.    My private practice, correct.

25        Q.    Okay.  And this shows that

12

1    president/director, Laura Hess, and there's also

2    a vice president/director, Edward Cherry

3    correct?

4         A.    Yes.

5         Q.    Is Mr. Cherry an attorney?

6         A.    Yes.

7         Q.    Does he practice at your law firm?

8         A.    Yes.

9         Q.    Is he licensed in Florida?

10        A.    New York.

11        Q.    In New York?

12             Okay.  This is a third one, again, the

13   printout from the Department of State.  Florida

14   limited liability company, Hess Kennedy

15   Holdings, Limited.  Manager, Laura Hess, Inc.

16   And there are some other managers listed there

17   on page two.

18             What is Hess Kennedy Holdings,

19   Limited?

20        A.    This would be, I'm more or less in

21   charge of the Florida lawyers.  All these

22   attorneys that are listed are Florida lawyers,

23   with the exception of the business manager,

24   Mr. Cherry.  Mr. Campos, Mr. Clyman -- there

25   should be a -- well, let me back up.

1              Mr. Clyman is in Chicago.  There's

2      another David that we have at our office, who is

3      a Florida lawyer, which I thought they added him

4      as a P.A.  Is this a current printout?

5          Q.    I printed it out today.

6          A.    Oh, you did?

7              Hess Kennedy Holdings is really the

8      division that we operate under our payroll

9      company.

10         Q.    Okay.  When you say payroll company,

11     payroll for the law firm Hess Kennedy, Chartered?

12         A.    Right.  But that's really all I know

13     about it.  I mean, I'm -- the business manager

14     would probably be better --

15         Q.    Okay.  The business manager is

16     Mr. Cherry?

17         A.    Correct.

18         Q.    Okay.  Now, this is one that's listed

19     as inactive.  But it has had a similar name.  I

20     just wanted to ask you about that one also.  It's

21     Hess, slash, Kennedy, LLC.  Do you recognize this

22     entity?

23         A.    I recognize this.  But I was not --

24     this is when I was practicing with Ms. Julian.  I

25     know that Hess Kennedy was formed between

14

1    Mr. Kennedy and myself.  Like I said, this was

2    back around 2004, 2005, before the amendment of

3    the code, which was about October '05.

4              I was still practicing under my private

5    Laura Hess, Inc., with criminal law issues,

6    family law issues.  And Mr. Kennedy was

7    developing the international law firm.

8         Q.    Okay.  And Mr. Kennedy, is that the

9    manager, Edward Kennedy, with an address in

10   Georgetown, Grand Cayman?

11        A.    Correct.

12        Q.    And this is showing as inactive.  To

13   your knowledge, is this entity now inactive?

14        A.    Correct.  To my knowledge, yes.

15        Q.    Okay.  And what is Edward Kennedy's

16   association with your present law firm, Hess

17   Kennedy Company, Chartered?

18        A.    He is one of the partners.

19        Q.    He's a partner?

20        A.    Yes.  And he is one of the partners

21   that developed the company with myself.

22        Q.    Okay.  And is Mr. Kennedy an attorney?

23        A.    Yes.

24        Q.    Is he licensed in Florida?

25        A.    He's licensed in New York.

15

1    Q.    In New York?

2          And where is Mr. Kennedy physically

3    present?  Is he in Florida or New York?

4    A.    Yes.  He makes his way between our

5    office here in Florida and the New York office.

6    But he's here the majority of the time.

7    Q.    Okay.  And you already said Mr. Cherry,

8    is he in Florida full time, or is he -- does he

9    work out of other offices too?

10   A.    He's in Florida full time.

11   Q.    Okay.  All right.  If you know -- this

12   is, again, a printout from the Florida Department

13   of State, Division of Corporations.  And the

14   fictitious name of a company, Debt Settlement of

15   America, this is from their fictitious name

16   registry.  The owners of the fictitious name are

17   listed at the bottom as Hess, slash, Kennedy, LLC

18   and Consumer Credit Counseling of America, Inc.

19   It shows the status as canceled.

20   A.    Yeah.  I'm not sure what the -- I

21   didn't --

22   Q.    Did you have any affiliation with Debt

23   Settlement of America?

24   A.    I don't recognize the name, Debt

25   Settlement of America.

1      Q.      Okay.  Do you recognize this address in

2    Daytona?  It's 1635 South Ridgewood Avenue, South

3    Daytona, Florida.

4      A.      No, I don't.

5              This is inactive, right?

6      Q.      Yeah.  It showed the fictitious name

7    has been canceled.

8      A.      That's good to know.  Because I don't

9    know about it.

10     Q.      Okay.  All right.  And also, if you

11   know, let me ask you about this one.  Again, a

12   printout from the Department of State, Division

13   of Corporations, Florida profit corporation, Hess

14   Kennedy Company Orlando.

15     A.      Yes.

16     Q.      Are you familiar with this entity?

17     A.      Yes.  I was there last week.  I go up

18   there probably once a week to help supervise.

19   We're actually looking for a full-time lawyer

20   right now in that office.

21     Q.      What is the affiliation between this

22   Hess Kennedy Company Orlando and Hess Kennedy

23   Company, Chartered, here in Fort Lauderdale?

24     A.      Hess Kennedy Company Orlando is an

25   independent company office from Hess Kennedy

1  Company, Chartered.  But, you know, we still

2  conduct the similar business.  But they do solely

3  settlement.

4       Q.    When you say settlement, do you mean

5  debt settlement work?

6       A.    Correct.

7       Q.    Is Hess Kennedy Company Orlando a law

8  firm?

9       A.    Yes.

10      Q.    The persons listed as officers and

11 directors are Michael Hutchinson and William

12 Rothchild.  Do you know if they're attorneys?

13      A.    I don't know.

14      Q.    Okay.  Do you have an ownership

15 interest from Hess Kennedy Company Orlando?

16      A.    Yes.

17      Q.    And can you describe that interest?

18      A.    I -- we receive a -- I receive a

19 paycheck from them.

20      Q.    And what do you do to receive the

21 paycheck from them?  What work do you do that you

22 get a paycheck from Hess Kennedy Company Orlando?

23      A.    Well, I drive three-and-a-half hours

24 each way and, you know, seven hours round trip

25 once, twice a week.  And -- because it's a

18

1    Florida office.  And my capacity and my

2    responsibilities are supervising Florida offices

3    and Florida attorneys.

4         Q.    Okay.  But if I -- do I understand

5    correctly that this is not an office of Hess

6    Kennedy Company, Chartered?

7         A.    Right.

8         Q.    This is a separate --

9         A.    Correct.

10        Q.    -- entity?

11             But you act as a managing attorney for

12   them?

13        A.    Correct.

14        Q.    Are there any other attorneys present

15   in that office?

16        A.    Actually, we're in the process of

17   hiring another full-time lawyer up there so I can

18   stop making this trip.

19        Q.    Okay.  So that would be no, there's

20   nobody there right now, is that correct?

21        A.    Besides myself coming up there.

22        Q.    Okay.  All right.  We talked a little

23   bit later about organization.  Maybe we can talk

24   a little bit more about the work between the two

25   entities.

19

1          Okay. Thank you. I just wanted to go

2   through those, because with all the similar

3   names, it's a little bit confusing.

4          Other than what you've just described,

5   do you presently own an interest in any other

6   business entity?

7      A.    No.

8      Q.    Or law firm?

9      A.    No.

10     Q.    Okay. Are your partner in any other

11  partnership?

12     A.    No.

13     Q.    Okay. All right. Who are the partners

14  in Hess Kennedy Company, Chartered? Can you name

15  the partners?

16     A.    Myself, Mr. Kennedy. And Mr. Chen

17  was -- he's in the process of being -- his shares

18  are in the process of being bought out. We're in

19  the process of severing our relationship with

20  him.

21     Q.    Okay. Were those the only other two?

22     A.    That's it.

23     Q.    Okay. And Mr. Chen, where was he

24  admitted to practice?

25     A.    He's admitted in Singapore.

20

```
1       Q.      And did he work in the Florida office?

2       A.      No.

3       Q.      Was he ever present in the Florida

4   office?

5       A.      No.

6       Q.      Okay.  How did you become affiliated

7   with him?

8       A.      Mr. Kennedy had met him at an asset

9   protection conference and had brought him in as

10   an international partner.

11       Q.      Okay.  How long was Mr. Chen a partner

12   with the law firm?

13       A.      I would say since 2004, 5.

14       Q.      Until now?

15       A.      Right.

16       Q.      Okay.  Other than Kennedy and Chen,

17   have there been any other partners of Hess

18   Kennedy Company, Chartered who are no longer

19   there?

20       A.      No.

21       Q.      And I'm sorry if you already answered

22   this.  But Mr. Kennedy is located where?

23       A.      He's here.

24       Q.      He's here?

25       A.      But he travels back and forth to New
```

1    York.

2        Q.    Okay.    Where are the offices of Hess

3    Kennedy Company, Chartered, other than the one

4    you've already described in Coral Springs?

5        A.    Okay.    We have one in London.    We have

6    one in Singapore, which we're obviously in the

7    business of making the proper adjustments.    We

8    have one in the Cayman Islands.    We have one in

9    South Carolina, Chicago and the Florida ones I

10   mentioned.

11       Q.    Okay.

12       A.    California, New York and New Jersey.

13             (Thereupon, Mr. Mark Dissette left the

14   room, then the following proceedings were

15   had:)

16       Q.    (BY MS. MORGAN)    Okay.    So it was the

17   intent to set up Hess Kennedy Company, Chartered

18   as an international law firm?

19       A.    Yes.

20       Q.    Okay.    Are there attorneys who are

21   employed by Hess Kennedy Company, Chartered?

22   Attorneys, associates -- attorneys that work for

23   the law firm?

24       A.    Oh, yes.

25       Q.    Okay.    Are there attorneys in the

22

1    London office?

2        A.    Yes.

3        Q.    And I'll skip Singapore.

4              Are there attorneys in the Cayman

5    Island office?

6        A.    Yes.

7        Q.    South Carolina?

8        A.    Yes.

9        Q.    Chicago?

10       A.    Yes.

11       Q.    California?

12       A.    Yes.

13       Q.    New York and New Jersey?

14       A.    Yes.

15       Q.    Where in South Carolina is the office,

16   the city, do you know?

17       A.    I don't know.

18       Q.    How about California, do you know the

19   city?

20       A.    I don't want to say -- I know it's a

21   little bit south of San Francisco.  I'm supposed

22   to go out there actually next month.  So I'll be

23   able to give you better --

24       Q.    Have you ever worked out of any

25   location other than Florida?

23

1      A.    No.

2      Q.    Okay.  The office -- let me ask you

3  this.  The office in Florida, the Coral Springs

4  office, what is the phone number at that office?

5      A.    We have 12 phone numbers.

6      Q.    12 phone numbers?

7      A.    Yeah.

8            The main number?

9      Q.    Yes.

10     A.    You know, when it started off -- just

11  to give you an idea, it started off with one

12  phone line.  So can you imagine the people that

13  were reaching out to -- it's growing

14  tremendously.  954-752-1950.

15     Q.    That's the main number?

16           Okay.  Is there an 800 number or 866

17  number that people can dial?

18     A.    Yup.

19     Q.    Do you know that?

20     A.    Nope.

21           And there's 877, 866.

22     Q.    Okay.  Those are toll free?

23     A.    Right.  Toll free for the clients and

24  creditors that need to call us.

25     Q.    Okay.

24

1    A.    Actually, I do know one of them.  I

2    just thought of it.  877, believe it's 556-debt.

3    Q.    Okay.

4    A.    And maybe 566-debt.

5    Q.    Okay.

6    A.    I do remember getting that number.

7    Q.    Okay.  Are there any other businesses

8    located in the office with Hess Kennedy Company,

9    Chartered?  Any other businesses, other than the

10   law firm located at that address?

11   A.    No.  Now, there are separate attorneys.

12   So do you want to know the names of the

13   organizations that they operate?

14   Q.    When you say separate attorneys, what

15   do you mean?

16   A.    We have the 210 address, and we have

17   the 3200 address, which is right up the street.

18   Q.    What is the 3200?

19   A.    3200 North University Drive, which we

20   had to expand.  We were trying to take over the

21   second floor of the building, but -- you know, we

22   didn't expect it would grow to fast.

23   Q.    Okay.  So you have two offices then?

24   There's one at 210 North University and one at

25   3200 North University Drive?

25

1      A.     Right.  And there's -- Jeff Campos

2  operates his Florida law firm as well.

3      Q.     Okay.

4      A.     As well as a David Lipman, who's also

5  Florida counsel.

6      Q.     L-I-T-T?

7      A.     L-I-P-M-A-N.

8      Q.     Okay.  Lipman.

9      A.     So those are the two that are in that

10 office.

11     Q.     Okay.  And I'm sorry, are they at 3200?

12     A.     Yes.  It's at Suite 210.

13     Q.     Okay.  Do they also work for Hess

14 Kennedy Company, Chartered?

15     A.     Yes.  But they also, like myself,

16 operate their independent -- which gives us the

17 freedom to do -- you know, when I came into this,

18 I was still passionate about doing criminal and

19 family.  Whereas, one of the members there still

20 has connections doing real estate, can still

21 operate and conduct our business as well.

22     Q.     Okay.  Are you the managing partner of

23 Hess Kennedy Company, Chartered in the Coral

24 Springs office?

25     A.     There's really no managing partner, per

26

1      se.

2          Q.    Okay.

3          A.    Basically -- kind of make the decisions

4      together, I guess you could say.

5          Q.    Okay.  Who makes the decisions

6      together; you Jeff Campos and is it David?

7          A.    No.  Because those attorneys -- now,

8      those attorneys are just shareholders, not

9      partners.  So the attorneys that would make the

10     decisions would be Mr. Kennedy and myself.

11         Q.    Okay.  All right.  How many employees

12     are at Hess Kennedy Company, Chartered at 210

13     North University?

14         A.    Approximately, or --

15         Q.    Yeah, just approximately.

16         A.    Well, it was now -- maybe 15.

17         Q.    Okay.  And what about at the other

18     office, at 3200?

19         A.    Maybe 30.

20         Q.    30?  Okay.  So it's a bigger office?

21         A.    Well, it's -- you know, we're trying to

22     put everybody places.  We hired probably about

23     15, 16 paralegals.  So we're just trying to get

24     the client communication and all the phone calls

25     taken care of.

27

1    Q.    Okay.  Do you have someone who is your

2    office manager?

3    A.    Yes.

4    Q.    Who would that be?

5    A.    At the --

6    Q.    210.  Let's start with 210.

7    A.    Okay.  Well, we have in -- the business

8    development manager is Edward Cherry, Mr. Cherry.

9         You mean more on the employee level

10   or --

11   Q.    Yes.  Who runs sort of the day-to-day

12   operation of the business there?

13   A.    Well, there's a Joseph Jacuzzi

14   (phonetic), who is more of, I would say, like a

15   floor manager type, who operates with the actual

16   employees.

17   Q.    Okay.

18   A.    But as far as the business relations

19   and business development, that's Mr. Cherry.

20   Q.    Okay.  So the 15 employees and 30

21   employees are -- you mentioned paralegals.  Are

22   any of those attorneys?

23   A.    No.

24   Q.    And are they paid a salaried wage?

25   A.    Yes.

28

1          MS. MORGAN:   Okay.   I'm going to sort

2     of go into another segment.

3          Does anybody have any questions about

4     what we've just been talking about?

5          MR. HATIC:   I may have misunderstood

6     this.   Is Mr. Kennedy's first name Edward or

7     George?

8          THE WITNESS:  Edward.

9          MR. HATIC:   Was there a George Kennedy

10    that you mentioned?

11         THE WITNESS:   (Witness shakes head from

12    side to side.)

13         MR. HATIC:   I guess I was wrong about

14    that.

15         Do you know the New York office

16    address?

17         THE WITNESS:   I don't know it by heart,

18    unfortunately.

19         MR. HATIC:   How about the Chicago

20    address?

21         THE WITNESS:  No.

22         MR. HATIC:   And you don't know the

23    address in South Carolina?

24         THE WITNESS:  No.

25         MR. HATIC:   Is there an attorney in the

29

1    Orlando office of Hess Kennedy?

2         THE WITNESS:  I'm the attorney -- I'm

3    the attorney in the Orlando office.

4         MR. HATIC:  How many employees are

5    there in Orlando?

6         THE WITNESS:  I would say 30.

7         MR. HATIC:  What's the principal

8    practice area of the Hess Kennedy, Chartered

9    law firm?

10        THE WITNESS:  Well, we address the

11   primary federal -- three federal statutes,

12   which are the Fair Credit Billing Act, the

13   Fair Credit Reporting Act and the Fair Debt

14   Collection Practices Act.  Federal statutes.

15        MR. HATIC:  And you represent consumers

16   in those contexts?

17        THE WITNESS:  Correct.  And make sure

18   that -- you know, they're billing -- I don't

19   know in-depth you want me to get into it.

20   But those are the primary statutes we address

21   and make sure they're, you know, not being

22   taken advantage of by the creditors and the

23   banks.

24        MR. HATIC:  Does the Hess Kennedy

25   Company, Chartered law firm's business come.

30

1    from principally outside of the state of

2    Florida?

3          THE WITNESS:  No.  Our main business

4    source is called First Consumer Debt

5    Consolidation.  And they -- if a party is

6    not qualified for debt consolidation or debt

7    management, they direct them to the law firm.

8          MR. HATIC:  So that firm makes

9    referrals to you?

10         THE WITNESS:  Well, they direct them to

11   us.

12         MR. HATIC:  Do you pay a referral fee

13   to that company?

14         THE WITNESS:  No.  We, in turn, provide

15   them legal services for a nominal fee.

16         MR. HATIC:  Who are the attorneys that

17   provide those legal services to this credit

18   counseling company?

19         THE WITNESS:  That would be mainly

20   myself and the other Florida lawyers.

21         MR. HATIC:  What's the total number of

22   lawyers that you have in your firm?

23         THE WITNESS:  In our office, my office?

24         MR. HATIC:  All of your offices.

25         THE WITNESS:  A hundred and twenty -- I

1      think it was a hundred twenty-one.  Oh, this

2      is also attorneys that we have, you know,

3      inclusive on retainer and jurisdictions that

4      we have not yet, obviously, opened offices

5      in.

6              MR. HATIC:  And do you treat those

7      hundred and some twenty some attorneys as

8      independent contractors?

9              THE WITNESS:  Yes.

10             MR. HATIC:  Do you have happen to have

11     a business card with you today?

12             THE WITNESS:  Do I?

13             MR. HATIC:  Yes.

14             THE WITNESS:  I think I do.

15             MR. HATIC:  Because I was wondering if

16     your phone numbers are on the business card.

17             THE WITNESS:  You know, I thought of

18     that.  But I didn't know if she wanted me to

19     check.

20             MS. MORGAN:  You can give me the card

21     at the end.

22             THE WITNESS:  Okay.

23             MR. HATIC:  Okay, Janet.

24             MS. MORGAN:

25     Q.     (BY MS. MORGAN)  Okay.  Going back to

1    your response to the question you were just asked

2    about, the First Consumer Debt Consolidation,

3    where is that located?

4         A.    In Delray Beach.

5         Q.    Delray?

6         A.    It's not for profit, 501(c)(3).

7         Q.    Okay. And are you a director of that

8    corporation?

9         A.    No.

10        Q.    Do you know who is.

11        A. .   Joel Carlson and Kurt Eggert

12   (phonetic).  But I'm not sure how it's listed on

13   Sunbiz or anything like that.

14        Q.    Okay. And how does the relationship

15   work between your law firm and First Consumer?

16   How does a client get from First Consumer to get

17   advice from your law firm?

18        A.    Well, I don't know if you're familiar

19   with the bankruptcy code at all.  But the

20   bankruptcy code has been amended in 2005, which,

21   as you can imagine, is the nature of why our

22   business is expanding.  People are required now,

23   I guess it's a hundred eighty days before filing

24   a petition in bankruptcy court to actually get

25   credit counseling.  This is why our business has

1    all of a sudden just expanded since 2005.

2            If they don't qualify for debt

3    consolidation, they send them over to the law

4    firm in hopes that we can help them with either

5    settling their debt or -- I mean, you'd be amazed

6    at some of the things that are inaccurately

7    reported under the federal statutes that I just

8    mentioned.  You know, I had a debt zeroed out

9    yesterday for $14,000, because they incorrectly

10   reported it.

11           And they're just constantly, you know,

12   harassing the consumers.  And, you know, these

13   people are basically at their wits' end, you

14   know.  They don't have -- they're just getting in

15   deeper and deeper.

16           They don't understand the truth in

17   lending; they don't understand regulations; they

18   don't understand these statutes.  And the

19   creditors are just propounding them.  And they're

20   getting nowhere.

21       Q.    How do customers get to First Consumer

22   Debt Consolidation?  How do they find them?

23       A.    That, I'm not sure of.

24       Q.    Have they already filed for bankruptcy,

25   they're interested in filing for bankruptcy?  Are

1    they operating as a -- I didn't catch the term in

2    the bankruptcy code.  But you have to get some --

3        A.    Credit counseling, right; you have to

4    get credit counseling.

5        Q.    Is that what the First Consumer Debt

6    does?

7        A.    Right.  And if they can't help them,

8    then we help them.  It seems as if with the

9    muscle of attorneys behind, people are -- as well

10   as debtors -- or creditors can be polite.  They

11   seem to be really negotiating with us in helping

12   to resolve some of these people's debt.

13       Q.    Okay.  So once an individual has gone

14   to see First Consumer Debt Consolidation -- and

15   you said perhaps they don't qualify for debt

16   consolidation.  Why would they not qualify?

17       A.    Well, debt consolidation is different.

18   People have to have a different -- it's a whole

19   bunch of numbers and standards.  But they still

20   have to have the amount to consolidate all their

21   debt and still formulate one payment.

22             These people are -- you know,

23   unfortunately, they can barely afford to pay

24   their mortgage, their car payments.  They're not

25   in any position to even consolidate their debts

35.

1    and make a monthly payment.

2        Q.    Okay.  So if someone went to first

3    debt -- I didn't write very clearly.

4        A.    First Consumer Debt Consolidation.

5        Q.    First Consumer Debt Consolidation.

6    What would that company do for them, if they did

7    qualify?

8        A.    Well, if they qualified, they would

9    consolidate their debt and, therefore, make

10   probably one payment or make the payments

11   lessened for them.

12       Q.    So a customer would make payments to

13   this company; this company would hold the money

14   and then make payments out to the creditors; is

15   that right?

16       A.    Right.

17       Q.    Okay.  And if they don't have enough

18   money to qualify to do that sort of consolidation

19   and they are, then, directed to your law firm,

20   what does your law firm do for somebody who, I

21   guess, comes -- I don't know if they come on the

22   telephone or through paperwork or in the door.

23       A.    Well, initially we do what's called an

24   audit.  An we go through all of their periodic

25   statements, trying to see if they're in

1   compliance with the statutes that I previously

2   mentioned and also truth in lending regulations.

3           A lot of times they're not accurately

4   reporting what their APR is. They're not

5   accurately reporting what their payments are.

6   Like I said, I got a debt erased yesterday,

7   zeroed out, $14,000 based on a billing error.

8           And, you know, these people are -- they

9   don't have the education that we have been

10  blessed with. And they basically get fearful.

11  And they -- you know, now they have lawyers

12  operating on their behalf to try and manage their

13  debt somehow and get them out of this.

14      Q.    Who's the first point of contact at

15  your law firm for someone who's directed from

16  this other company?

17      A.    Well, they receive a welcome letter and

18  a welcome package. And it has my name on it.

19  They can contact me. I have paralegals that are

20  available at a 1-800 number.

21      Q.    Okay. Have they been told by First

22  Consumer Debt Consolidation that they're being

23  referred --

24      A.    Yes.

25      Q.    -- or that they're being directed to

1    the law firm?

2         A.    Of course.  We have separate retainer

3    agreements with them.

4         Q.    Okay.  So how do you first become aware

5    that someone has been referred to you or directed

6    to you?  How does your law firm become aware that

7    First Consumer Debt Consolidation is sending

8    someone to your firm?

9         A.    Well, they would send somebody over

10   that they think would qualify and be better

11   served through our law firm.

12        Q.    Do you receive from them a list of

13   names, we're sending you these people?

14        A.    We usually receive files, receive

15   files.  But then there's a separate -- then, we

16   start our process with a separate retainer

17   agreement and separate package for them.

18        Q.    Okay.  So they would -- once they have

19   been sent to your office, they, then, enter into

20   a retainer agreement with Hess Kennedy Company,

21   Chartered?

22        A.    Correct.

23        Q.    Okay.  And how is that retainer

24   agreement given to them?  As I understand, a lot

25   of these people don't necessarily live in

38

1    Florida, correct.

2         A.    Right.

3         Q.    Okay.  So how do -- a retainer

4    agreement is sent to them?

5         A.    Right.  Either -- because we like to

6    have a wet signature, obviously, and -- because I

7    mean, we've been taught for years to get a

8    retainer agreement, get a signature.  So that's

9    very important to us.

10              Initially, we can send them, if they

11   want to look at it by electronic mail.  But we

12   require a hard signature.

13        Q.    Once a customer becomes a client, does

14   that end their relationship with First Consumer

15   Debt Consolidation?

16        A.    Yeah.  There's really no reason for

17   them to --

18        Q.    Okay.  So then they're a client of your

19   law firm?

20        A.    Correct.

21        Q.    So you you're not providing legal

22   services to First Consumer Debt Consolidation;

23   you're providing services to individuals who come

24   to you through that entity?

25        A.    Right.  And then like I said, I

39

```
1    return -- because we don't take any referral fees
2    from them.  We, in turn, would provide them with,
3    you know, legal advice if they needed it, for a
4    nominal fee.
5         Q.    To their corporation?
6         A.    Correct.
7         Q.    Okay.  When someone has signed a
8    retainer agreement what happens next?  Who talks
9    to them in your office?
10        A.    Well, any one of the paralegals talks
11   to them.  Like I said, there's between probably
12   16 and 20 paralegals.
13              I talk to numerous people.  And, you
14   know, mostly people don't understand the program
15   and are -- just need a little bit more
16   understanding of how it works.  I try to take all
17   those calls.  But as you can imagine, I rely on
18   my paralegals a lot to help me with that.
19        Q.    And is there sort of a standard
20   procedure for handling the cases that come in?
21   Are there standard letters that go out --
22        A.    Yes.
23        Q.    -- to creditors, that kind of thing?
24        A.    Yes.
25        Q.    Okay.  And what is your goal for these
```

40

1    clients?   What are you trying to accomplish?

2         A.    Well, we're trying to give them, above

3    anything, just to -- you know, these people

4    are -- a lot of people are in a place where

5    they're coming out of broken marriages, or

6    they're just completely at the bottom.  And a lot

7    of them have no hope.

8              You know, they're having these

9    creditors call them 24 hours a day, from the

10   moment they get up, to the time they go to sleep

11   and harass them with letters.  And they feel like

12   they have no way out.  And they're not

13   sophisticated enough to actually understand what

14   is going on.

15             So that's where we come in.  And we

16   have them forward everything to us.  So we take,

17   relieve them of all that, the calls.  And we

18   relieve them of all the correspondence.  It's all

19   directed to us now.

20             Just like representing you're client,

21   they no longer can contact our client.  We're

22   their attorney.

23        Q.    Okay.  So you become the attorney,

24   you're the point of contact for any creditors,

25   and you advise the creditors of that?

41

1    A.    Uh-huh.

2    Q.    And then you -- I believe you're saying

3    that you review the files of the client to see if

4    all the debts are valid debts or if maybe there's

5    some mistakes in the reporting, that kind of

6    thing?

7    A.    Uh-huh.

8    Q.    Now, do you also work out a debt

9    settlement arrangement for them?

10   A.    Correct.

11   Q.    Is that something your law firm also

12   does?

13   A.    Uh-huh.

14   Q.    How does that work?  If you're working

15   a debt settlement arrangement for a client with

16   the various creditors, what does your law firm

17   do?

18   A.    Well, it's based upon -- obviously, it

19   depends upon how much debt they have.  But there

20   is approximately -- there's a fee that we take.

21   You know, there's approximately 15 percent of the

22   debt that if you average it out, ends up being --

23   I mean, nothing:  You know, hourly.

24        We're used to making 300, 400 an hour,

25   200 an hour.  I mean, in hindsight, it's nothing.

1    But if you put a lot of them together, you know,

2    that's how you end up making some money.  But

3    that's -- it's -- then, we take their monies in a

4    monthly payment basis.

5        Q.    Okay.  And then that money goes out to

6    creditors?

7        A.    Well, the money goes into an escrow

8    account.  And once they've built up sufficient

9    funds, and once we've received a settlement that

10   corresponds with what they have in their escrow

11   account, we released funds to the debt -- the

12   creditor.

13       Q.    Okay.  And the negotiations with the

14   creditors, that's something that your staff, your

15   paralegals do?

16       A.    Uh-huh.  A lot of it, I do.

17       Q.    And you do?

18           Okay.  And where is the money while

19   this negotiation is going on?  When they're

20   making their payments and accumulating enough

21   money in order to get a settlement, where is that

22   money?

23       A.    It's held in an escrow account.

24       Q.    A law firm escrow account?

25       A.    Right.

43

1          MR. HATIC:   Escrow account or trust

2     account?

3          THE WITNESS:   Escrow account.

4     Q.     (BY MS. MORGAN) And you kind of just

5     answered this question.  But how do you -- how

6     does your firm get paid; do you have a percentage

7     of the total debt of any individual client; is

8     that --

9          A.     Right.

10         Q.     -- what you said, 15 percent?

11         A.     Well, it averages out to be more or

12    less than 15 percent of the debt.

13         Q.     Okay.  And that fee, when do you take

14    your fee, just out of -- is that after their --

15    they've reached a settlement or as the payments

16    come in?

17         A.     As the payments are coming in.

18         Q.     About what percentage of your clients

19    come through this First Consumer Debt

20    Consolidation?

21         A.     All of them.

22         Q.     All of them?

23         Okay.  Is there any other debt

24    settlement, debt consolidation firm that directs

25    clients to your law firm?

1      A.      No, not that I'm aware of.

2      Q.      Is there any other -- I think kind of

3  the same question, asked slightly a different

4  way.  But is there any other way that Hess

5  Kennedy Company gets debt settlement clients?

6      A.      Yeah.

7      Q.      Do you ever have people just walk in

8  the door?

9      A.      Well, yeah.  Just like when you're out

10  doing whatever you do daily, you know, picking up

11  criminal clients, family law clients, you talk

12  about your business.

13      Q.      Okay.  So you do have some clients that

14  come in?

15      A.      Yeah.

16      Q.      Okay.  I noticed on your web site, you

17  also list some other services, bankruptcy, wealth

18  management, asset protection.  Are those things

19  that the law firm also does?

20      A.      Yes.

21      Q.      Okay.  What percentage of the practice

22  of the firm would you say is from the debt

23  settlement area?

24      A.      Ninety percent.

25      Q.      Okay.

45

1        A.    Well, is that exclusive of the

2    independent, like Laura Hess, Inc.?

3        Q.    Yes.  Yes, independent of Laura Hess,

4    Inc.

5              Okay.  Do some of these people ever end

6    up filing for bankruptcy, do you ever recommend

7    that they do that?

8        A.    Some of them do.  But it's very few,

9    very few and far between.

10       Q.    Why is that?  Because --

11       A.    Because this program works.  I mean, it

12   really does.  We're really relieving people of

13   their debt.  So it's working.

14             MS. MORGAN:  Okay.  I'm going to move

15       on to another segment regarding this,

16       specific letters.

17             Does anybody have any questions about

18       what we just talked about?

19             MR. HATIC:  The fee that you earned and

20       you sweep from, I guess, the escrow account

21       when the settlement is effect -- is that

22       correct?

23             THE WITNESS:  Can you rephrase that?

24             MR. HATIC:  Yes.  You said that you

25       take your clients' money, and you put it in

1    escrow account.

2                    THE WITNESS:   Correct.

3                MR. HATIC:   And then at some point you

4    earn approximately 15 percent of this

5    settlement amount, correct?

6                    THE WITNESS:   Of the total debt.

7                MR. HATIC:   Of the total debt?

8            And that your clients are making

9    monthly payments.  So are you taking your

10   payment as a lump sum at the front end, or do

11   you take it along the way?  Your firm's fee.

12               THE WITNESS:  Well, it actually

13   depends.  Because, you know, if somebody has

14   a really good payment history -- because

15   remember now, we're dealing with people that

16   a lot of them are destitute and not a lot of

17   monthly payments aren't going through.  But

18   the people that do have a very good payment

19   history, sometimes we end up even fronting

20   the settlement debt.

21               MR. HATIC:  So, then, when you take

22   what is the firm's fee, you put that into the

23   firm's operating account?

24               THE WITNESS:  I know they're kept

25   separate.  But I don't do any of the --

47

1    MR. HATIC:  Well, who makes the

2   distribution to the directors and

3   shareholders?

4        THE WITNESS:  The business manager.

5        MR. HATIC:  And the shareholders are

6   the lawyers that you indicated?

7        THE WITNESS:  Uh-huh.

8        MR. HATIC:  Is Mr. Cherry a

9   shareholder?

10        THE WITNESS:  Yes.

11        MR. HATIC:  Is there a receptionist

12   that takes calls when --

13        THE WITNESS:  Yeah, we have a

14   receptionist as well.

15        MR. HATIC:  Does the receptionist

16   direct the calls to paralegals?

17        THE WITNESS:  We have at our office --

18   there's two different systems.  At our

19   office, we have a menu where if you're

20   attorney or judge, you can direct towards

21   one.  If you're a creditor, you get directed

22   toward another way.

23        If you need to speak to a lawyer, it's

24   kinds of a system -- but we still have a

25   receptionist that gets the default calls.  At

48

1    the other office, it's exclusively paralegals

2    answering the calls.

3         MR. HATIC:   Okay, Janet.

4    Q.    (BY MS. MORGAN)  Have you ever seen the

5    contract that First Consumer Debt uses --

6    A.    No.

7    Q:    -- with their -- okay.  I just wondered

8    if it mentioned legal services or talked about

9    legal services at the outset, I mean, people come

10   in there, do they understand that there's a

11   possibility that they may be sent on to a law

12   firm?

13   A:    Yeah, everything is -- I mean,

14   everything is clear and spelled out for them.

15   Which is also why we interject that separate

16   retainer agreement, so they know, okay, now,

17   it's the point that your relationship has ended

18   with them, and your relationship is beginning

19   with us.

20   Q.    Okay.  Did you mention Adam Formain

21   (phonetic)?  Do you know an Adam Formain?  Does

22   he work for you?

23   A.    He was in the business office.  He's no

24   longer there.

25   Q.    Was in the business office in Fort

49

1    Lauderdale -- or Coral Springs?

2        A.    Yes.

3        Q.    Okay.  And when you say the business

4    office, of the law firm?

5        A.    Corporate office.  We call it the

6    corporate office.

7        Q.    Okay.  And when did Mr. Formain leave?

8        A.    A few weeks ago.

9        Q.    Okay.  And was that an amicable

10    parting?

11        A.    I'm not in charge of hiring and firing,

12    so --

13        Q.    Okay.  Did you --

14        A.    I know he was someone who thought that

15    he was kind of -- he was one of those that was --

16    felt he was larger than life type of person.  You

17    know what I mean?

18        Q.    Who brought him into the company or law

19    firm?

20        A.    I don't know.  The only person I know

21    that they do the firing is the business office,

22    so --

23        Q.    Okay.  So that would have been

24    Mr. Cherry?

25        A.    Right.

50

1    Q.    Okay.   I'm going to move on and talk

2    about some of these individual letters that are

3    on letterhead of -- I'm going to let you tell me

4    if it's your law firm or not.  And this first

5    one, I'm going to start marking these exhibits,

6    and we're going to talk about them a little bit.

7          Exhibit 1.  There's an extra copy there

8    for your attorney.  Would you please take a look

9    at that.

10         It's a letter, dated October 17th,

11   2006.  And it's signed by a Walter Chen.  Hess

12   Kennedy Company.  Is this -- do you recognize the

13   letterhead of this stationary?

14   A.    Yeah.

15   Q.    Is this the letterhead from your law

16   firm?

17   A.    Well, it's different than that now.  I

18   think it's -- this is like old letterhead.  I

19   know for a fact that it's old letterhead.

20   Q.    Okay.  It's written on the stationary

21   with the address of North University Drive, Fort

22   Lauderdale, which I believe is actually Coral

23   Springs.

24   A.    Right.

25   Q.    But you did say that Mr. Chen never

1    worked in that office, correct?

2        A.    No.  This was a -- like a form -- when

3    we initially -- let me back up a little bit.  We

4    initially started developing the international

5    law firm.  We retained counsel in D.C. for

6    opinions on letterhead and for the web site.

7            Her name's Lewis Rose, up at Drye,

8    Shannon, Collier.  Anyway, this was part of a

9    form letter.  We don't even -- this isn't -- we

10   don't even use -- this is not a letterhead we use

11   from our office.

12           This is like an old form letter that

13   went out after we received an opinion back from

14   D.C. counsel, we sent out a memo to all the

15   partners with -- this was like -- this was like a

16   form.

17       Q.    Okay.  I was going to ask you about the

18   content of the letter.  Because it looks like --

19   well, why don't you tell me what kind of a form

20   letter this is.  When would this type of letter

21   have been used?

22       A.    This would be in the initial stages,

23   after, you know, we first -- kind of trying to

24   establish that we represent the clients, so they

25   cease and desist from contacting the client.  And

1    that we're conducting the briefing under 11,

2    United States Code.  And, you know, obviously

3    taking care, doing the audits with the file,

4    which I talked about briefly, with the -- seeing

5    if there's any billing errors or whether they're

6    in compliance with the federal statutes, this

7    would go out.

8            And I think it goes into that a little

9    bit more in the next paragraphs.  Yeah.  It goes

10   into cease and desisting.  This would be one of

11   the initial letters that would go out to a

12   creditor.

13       Q.    Okay.  And Mr. Chen was a licensed

14   attorney in Singapore, but did these letters also

15   go out under the signature of nonlawyers, to your

16   knowledge?

17       A.    I think -- I know they all -- now,

18   there's a policy of them all having to pass

19   through the lawyers in the office to be signed.

20   You know, it was never my understanding -- this

21   is -- I mean, this is a form.  I don't even

22   understand why he's on this stationary.

23       Q.    Okay.

24       A.    You know, I received his response.  So

25   it's not my first time seeing that this is --

53

1   was -- was done with the signature.

2         Q.    Okay.  I don't want to digress too much

3   here.  But this just occurred to me.  How is

4   it -- the cases that come into your office, the

5   clients that come in from the debt consolidation

6   company, do they all stay in the Florida office,

7   or are they farmed out to the different offices

8   in other states and --

9         A.    Right.

10        Q.    -- countries?

11              They are?

12        A.    Yes, they are.  And the different

13  attorneys in the different jurisdictions conduct

14  the audits that I previously talked about.

15        Q.    So under what circumstances would

16  Mr. Chen in Singapore have been writing a

17  letter -- it doesn't show on here, but my

18  recollection is Mr. Lowery's office was in

19  Colorado.  And I don't know where the client was.

20              What circumstances would Mr. Chen in

21  Singapore be writing a letter like this?  How

22  would he have gotten --

23        A.    Well, he never would have been

24  authorized with my address here, for -- let me

25  establish that first and foremost.  Would he ever

54

1   be writing correspondence into the United States?

2   Yes. And that would be, you know, his nation --

3   he's a signatory nation to the general agreements

4   against tariffs and trades.

5          Now, if there's a state that's

6   operating that is not a friendly state to

7   state -- you know, they're trying to regulate

8   state law -- I don't know if you're familiar with

9   the general agreements against tariffs and

10  trades. But that treaty will trump state

11  regulations. And that will provide for federal

12  law to take over state law.

13         It's an international commerce clause

14  to prevent a barrier from having other people

15  benefit from -- it's like a free trade.

16     Q.    Is it your opinion that that enables an

17  attorney from another country to practice law in

18  the United States?

19     A.    No, it's not practicing law, no.

20     Q.    Okay. So your opinion, then, is that

21  what he was doing by signing this letter would

22  not have been the practice of law, that's why he

23  would sign it?

24     A.    No. He would be allowed to -- the

25  initial correspondence. But he would not be

55

1    able -- he would not be permitted from that point

2    on to establish any, like, systematic, continuous

3    relationship there.  At that point, there would

4    be local counsel that would be -- like I said, we

5    had people we would reach out to in 48 states to

6    take it from there.

7         Q.    Okay.  I'm going to show you what I've

8    marked as Florida Bar Exhibit 2, also signed by

9    Mr. Chen.

10             MR. TYNAN:  So we're going to make a

11        pile of the actual exhibits?

12             MS. MORGAN:  Yes, thank you.

13        Q.    (BY MS. MORGAN)  And I ask you to take

14   a look at that letter.  And Mr. Lowery's in

15   Colorado.

16             Its dated November 7th, 2006.  And is

17   this also a letter that appears to have been

18   generated by Hess Kennedy Company, Chartered?

19        A.    Once again, if I can digress.

20        Q.    Uh-huh.

21        A.    This was meant to be almost like a

22   template, okay.  Now, any attorney who sends

23   from another jurisdiction, you know, to have the

24   Hess Kennedy Company on there, but he's -- was

25   never authorized to send that with our address on

1    the bottom.    That is not -- that was operating as

2    a template or a form that was attached to the

3    response from our Washington counsel.

4         Q.    Do you recognize the form of this

5    letter?  Is this a letter that would have been

6    sent in another particular circumstance?

7         A.    I don't recognize ma'am, Dear ma'am.  I

8    don't recognize that salutation.

9              Denying the validity of the debt, I

10   recognize that.  I recognize the U.S. Code,

11   subsection 1692(c).

12              Yeah, I mean, this is one of the -- a

13   form letter.

14        Q.    That goes to?

15        A.    That goes to the various attorneys.

16   But, then, they need to make the proper

17   adjustments, you know.  I mean, you would think

18   that anybody who has a law degree would put that

19   together, put it on their own address and

20   correspondence.

21              It's getting me --

22              MS. MORGAN:  Okay.  Does anybody have

23   any questions about those two letters from

24   Mr. Chen?

25              MR. FRAVEL:  Curious to know why they

57

1    severed ties with Mr. Chen.

2          THE WITNESS:  We severed -- well, I'll

3    tell you, actually, this organization brought

4    that about.  It brought it to my attention.

5          I had no idea, until I received the

6    response from Mr. Chen on the form

7    letterhead, that he was using the formatted

8    letterhead with our address.  And to me, to

9    be a partner in an international law firm and

10   to actually receive an opinion from D.C.

11   counsel that clarifies the dos and don'ts of

12   corresponding -- and, you know, out of

13   jurisdiction.  It's ignorance.

14          And I don't want to be partners with

15   someone who is ignorant, is the bottom line.

16          MS. MORGAN:  Okay.

17          MR. FRAVEL:  Thank you.

18   Q.    (BY MS. MORGAN)  Okay.  I show you what

19   I'm marking as Exhibit 3, with an extra copy, and

20   ask you to take a look at that.

21          This is a letter that's signed by an

22   individual named Andrew Hersant, H-E-R-S-A-N-T,

23   on Hess Kennedy Company stationary, dated August

24   31st, 2006.

25          Do you know who Andrew Hersant is?

UPL
PUBLIC RECORD

1  A.  Yeah. He's -- he is an attorney in

2 Cayman and London.

3  Q.  He's an attorney in Cayman and London?

4  A.  Uh-huh.

5  Q.  Okay.  Is he a partner or an associate?

6  A.  No.  He's not even with us anymore.

7  Q.  Okay.  At the time that he wrote this

8 letter, was he with Hess Kennedy Company,

9 Chartered?

10  A.  Uh-huh.

11  Q.  Yes?

12  A.  August, yes.

13  Q.  Okay.  And he was located in -- you

14 said there's an office in Cayman Islands?

15  A.  Uh-huh.

16  Q.  Is that where he was located?

17  A.  Correct.

18  Q.  Okay.  And you said he's no longer with

19 the firm.  When did he depart the firm?

20  A.  He took a position with a bank, a

21 full-time position with a bank.

22  Q.  About how long ago, if you remember.

23  A.  No.  I would say it was sometime last

24 year, the end of last year.  I'm really not sure.

25 I don't really want to put a date out there.

59

Q.   Okay.   And how would Mr. Hersant, an attorney located in Cayman for Hess Kennedy and Company, have received a file for a client?

A.   Same rationale as Mr. Chen.   The files are distributed amongst the attorneys, whereby, they conduct the audits.   If they find any violations with the federal statutes, they, in turn -- the norm is to send correspondence to us an updated kind of audit of the file, what they think is going on in the file.

But in the event -- once again, this is -- he's admitted in the Cayman Islands, which is also a signatory nation to the GAT.   So that may have been the instance in this case.

Q.   Okay.   But he is not and was not a partner; is that correct?

A.   No.

Q.   Who else was located in the Cayman office, how many people are there?

A.   There's Mr. Miller.   Mr. Miller is the only other one I know of, just the two of them.

Q.   Is Mr. Miller an attorney?

A.   Yes.

Q.   Is he the supervising attorney?

A.   That, I don't know.

60

1    Q.    Is he a partner?

2    A.    That, I don't know.  Oh, he's not a

3  partner in my firm, no.

4    Q.    Yes, of your firm.

5    A.    Oh, no.

6    Q.    Okay.  So there's not a partner located

7  in the Cayman Islands?

8    A.    No.

9    Q.    Who's responsible for supervising that

10  office?

11    A.    That would be the partner -- or sorry,

12  let me not phrase -- use partner term.  The

13  attorney who's in that office.  I mean, the

14  only -- we don't supervise any of the foreign

15  jurisdictions.

16    Q.    Okay.  So if Mr. Hersant was the

17  attorney in that office, he would have been

18  responsible?

19    A.    Right.  He's responsible for

20  generating, you know, his -- he's responsible for

21  his office, yes.

22    Q.    Okay.  Let me show you one that's

23  marked as Exhibit 4, and ask you to take a look

24  at that.  It's copied slightly crookedly.

25    But Hess Kennedy Company, September

1    1st, 2006, signed by a Michael Morgan.  Again,

2    also, the 210 North University Drive.

3        A.    This is obviously the same situation.

4    And I am -- you know, I just don't understand how

5    a lawyer doesn't get it.  I mean, we sent out a

6    clear memorandum of law, accompanied from the

7    partner, Lewis Rose, from our Washington, D.C.

8    firm, explaining the dos and don'ts of

9    correspondence of letters, of what's right, of

10    what's wrong.

11        I mean, this is --

12    Q.    Okay.  Who is Michael Morgan, first of

13    all?

14    A.    He's an attorney in New York.

15    Q.    He's in New York?

16        Okay.  And is he licensed in New York?

17    A.    Yes.

18    Q.    Okay.  And so he works out of the New

19    York office?

20    A.    He's not at Hess Kennedy anymore.

21    Q.    He is no longer with Hess Kennedy?

22    Okay.

23        MR. FRAVEL:  The reason?

24        THE WITNESS:  He's actually started his

25    own company, which might be a competing

62

1       company.

2              Q.      (BY MS. MORGAN)  Okay.  And this

3       particular letter, this is --

4              A.      It's a form.

5              Q.      It's a form letter that goes out to a

6       creditor?

7              A.      Form letters, correct.

8              Q.      Okay.  Was Mr. Morgan a partner?

9              A.      No.

10             Q.      Okay.  The last one I handed you was 4;

11      is that right?

12             A.      Yes.

13             MR. TYNAN:  Correct.

14             Q.      (BY MS. MORGAN)  Let me show you what

15      I've labeled as Bar Exhibit Number 5.  It's a

16      one-page fax cover sheet.

17             MR. FRAVEL:  With a toll free number on

18      it.

19             MS. MORGAN:  Oh, thank you.  I can ask

20      her if that's the number.

21             Q.      (BY MS. MORGAN)  This one has a printed

22      name but no signature.  Anthony Francisco,

23      counselor.  There's no indication of where

24      Mr. Francisco is.  Do you know Mr. Francisco?

25             A.      I actually did some -- I guess this

1   name was mentioned to my attorney.  And I had

2   done some research on Mr. Francisco.  He was a

3   debt counselor at First Consumer Debt

4   Consolidation.

5       Q.    At First Consumer?  Okay.

6       A.    He was like -- he was an agent, if you

7   will.  He was not -- a nonlawyer.  He's not a

8   counselor, I guess.

9       Q.    Okay.  Why, if you know, would

10  Mr. Francisco be sending out a fax --

11      A.    I have no idea.

12      Q.    -- on Hess Kennedy Company letterhead?

13          Do they have copies of your stationary

14  at the debt consolidation company?

15      A.    I don't recognize this actual fax cover

16  sheet.  We put Hess Kennedy Company, but it's in

17  a different font.  And we actually have the

18  chartered now.

19          So it doesn't even -- it's not -- I

20  mean, it's not even the same -- whereas, the

21  letters are our form.  This is nothing -- this is

22  nothing that we use.

23      Q.    Would there have been any authorization

24  for First Consumer Debt to use your law firm

25  letterhead?

64

1    A.    No.  Not by me.

2    Q.    Have you ever been aware of them using

3    the law firm letterhead?

4    A.    No.  Because it's very -- we're very

5    clear, that when they leave their relationship

6    with First Consumer, now, they're entering their

7    relationship with Hess Kennedy.

8    Q.    Okay.  So he's at First Consumer.

9          When you were doing your research, did

10   you find out if he's still there?

11   A.    I don't think he's still there.

12   Q.    And what did you say the name of the

13   person is in charge at First Consumer Debt?

14   A.    Joel Carlson.

15   Q.    Is it a K or C?

16   A.    C.

17         And Kurt Eggert is his partner.

18   Q.    Okay.  Do you know about how many

19   people they employ?  Have you ever been there?

20   A.    No, no.  Actually, I have been to the

21   previous address, which was off of Lake Worth.

22   But they've since then opened an office in

23   Delray.  This was -- the previous office in Lake

24   Worth, it was shout down -- it wasn't shut down.

25   Let me rephrase that.  They moved locations.

65

1      Q.    Do you know the street there in Delray?

2      A.    No.  I think it's Atlantic.  But I

3  don't want to put that out if I'm not sure.

4      Q.    Okay.

5      A.    I know the previous address.

6      Q.    I'm going to show you what I'm going to

7  label Bar's Exhibit Number 6, and ask you to take

8  a look at this.  I don't know the date that this

9  was generated.

10          But as you can see at the top, it has

11  the Hess, slash, Kennedy attorneys.  Appears to

12  have been sent from Debt Settlement of America.

13  Do you recognize this letterhead, this Hess,

14  slash, Kennedy attorneys?  Is that anything your

15  law firm has ever used?

16     A.    It looks familiar.  But I don't

17  recognize the name using it, so --

18     Q.    You don't recognize Debt Settlement of

19  America?

20     A.    No.  And I don't -- like I said, the

21  only one I'm aware of is First Consumer Debt

22  Consolidated.  But that's the only one I'm aware

23  of.  But I'm also not the -- I'm the attorney,

24  not the business manager.  So I'm only giving you

25  information I know.

66

1      Q.     Okay.   And it's not very legible, but

2   at the bottom there's an address.   And there's

3   one address in Washington, and there's an address

4   in Coral Springs.   I believe it's 1 -- maybe 12

5   or 11600 North West 56th Drive.   Do you recognize

6   that?

7      A.     No.   Never been at that address.

8      Q.     So your law firm has never been located

9   at that address?

10     A.     No.

11            Am I going to get copies of these?

12         MR. TYNAN:   Yeah.   She gave those to

13     me.

14            THE WITNESS:   This is enlightening for

15     me as well, some of this.

16     Q.     (BY MS. MORGAN)   Okay.   I really wanted

17  to go through those to sort of identify the

18  people and the types of letters.

19            Who sends out what kind of letters?   I

20  mean, do the paralegals and the attorneys send

21  out the letters to the creditors or --

22     A.     Every letter -- it is our policy that

23  every letter is signed by an attorney before it

24  leaves the office.

25     Q.     Every letter?

UPL
PUBLIC RECORD

1     A.    Uh-huh.

2     Q.    Okay.

3     A.    It gets to be a lot, but -- when we sit

4 there and sign them, because we have to.

5     Q.    Okay.  Have you been notified or made

6 aware of any investigations by any other state

7 bars or state agencies or entities --

8         THE WITNESS:  No.

9     Q.    -- at this time?

10        Okay.  Does anybody else have different

11 questions?

12        MR. HATIC:  Do you have written

13 agreements with your independent contractor

14 lawyers that you hire?

15        THE WITNESS:  Yes.

16        MR. HATIC:  Do you have a partnership

17 agreement with Mr. Kennedy?

18        THE WITNESS:  Yes.

19        MR. HATIC:  And do you have shareholder

20 agreement?

21        THE WITNESS:  Yes.

22        MR. HATIC:  So I just -- I'm not clear,

23 and I apologize for this.  So the Hess

24 Kennedy Company, a chartered law firm, you

25 and Mr. Kennedy are the directors?

68

1          THE WITNESS:  Correct.

2          MR. HATIC:  And there are additional

3   individuals who are shareholders of that

4   entity?

5          THE WITNESS:  Correct, all attorneys.

6          MR. HATIC:  How many of those?

7          THE WITNESS:  I provided them to you.

8   I think there was like seven or eight.

9          MR. HATIC:  And that includes

10   Mr. Cherry?

11          THE WITNESS:  Right.

12          MR. HATIC:  Okay.

13          MR. MARTONE:  I have one question.

14   When a debtor calls the counseling company,

15   and it's determined that it needs to be

16   referred to an attorney, how does it get

17   assigned to the attorney?

18          THE WITNESS:  You mean each individual

19   file?

20          MR. MARTONE:  Yeah.  I mean, some of

21   them -- I noticed one attorney is in the

22   Cayman Islands, another attorney is in New

23   York.  How do you make a determination as

24   to --

25          THE WITNESS:  The business manager, I

69

1    know, divides them up.  And we're each

2    allocated a certain amount.  Whether there's

3    any that are, like I said, mentioned

4    previously, any states that have adopted ABA

5    5.5, that aren't as friendly to our type of

6    work, whether those are divided up to the

7    signatory nations, that could be possible as

8    well.

9         MR. HATIC:  Is Mr. Cherry the business

10   manager?

11        THE WITNESS:  Yes.

12        MR. HATIC:  So he directs all the work

13   for the firm?

14        THE WITNESS:  Correct.

15        MR. HATIC:  And he does that for

16   Florida?

17        THE WITNESS:  Correct.

18        Q.    (BY MS. MORGAN)  But you said that he's

19   also an attorney, didn't you?

20        A.    Uh-huh.

21        Q.    Does he do any legal work as an

22   attorney?

23        A.    No.

24        Q.    He just works as a business manager?

25        A.    Correct.  He's a great business manager

1    too.                                                                    70

2            MR. FRAVEL:  If I may ask, how many

3    customers do you have?

4            THE WITNESS:  Well, we actually, I'm

5    proud to say, have over 5,000 now.  We

6    started with myself Mr. Kennedy and a

7    receptionist.  So it's grown a lot.

8            But obviously, with the volume, we also

9    need to, you know, get a hold of a lot of

10   things too.  We're helping a lot of people.

11       Q.    (BY MS. MORGAN)  Do you ever do any --

12   other than doing the debt settlement work, if one

13   of the clients is sued by a creditor somewhere,

14   do you represent them in a lawsuit?

15       A.    Well, Florida -- there's -- there's

16   actually a distinction.  We try to make that --

17   that we are not litigation counsel.  Because

18   obviously our corporate office is operated out of

19   Florida.

20            So what we do is if it gets to a point

21   where it gets litigious, they're sent to the

22   attorneys that we have in the different states.

23   Like I mentioned before, we have connections with

24   approximately all 48 states -- actually, we do.

25   So it's about hundred and twenty.

71

1        Q.      Okay.  So if somebody, a client, did

2  call and notify you that they had been served

3  with a lawsuit, then you would associate a

4  counsel in that jurisdiction?

5        A.      Correct.

6        MS. MORGAN:  Okay.  Anybody have any

7  questions for Ms. Hess?

8        Okay.  I think that covers -- I think

9  that covers what we need to know for this

10  committee.  If I have any other questions,

11  obviously --

12        MR. TYNAN:  Call.  Glad to help where

13  we can.

14        MS. MORGAN:  -- I can contact your

15  attorney.  And I think that concludes.

16        (Witness excused.)

17        (Thereupon, The Florida Bar's Exhibit

18  Numbers 1 through 6 were marked for

19  identification.)

20        (Thereupon, the sworn statement was

21  concluded at 5:33 p.m.)

22

23

24

25

72

CERTIFICATE OF OATH

THE STATE OF FLORIDA,)
                     )
COUNTY OF PALM BEACH.)

I, the undersigned authority, certify that LAURA LYNN HESS personally appeared before me and was duly sworn.

WITNESS my hand and official seal this 30th day of May, 2007.

_____
PILAR A. STENZEL, R.P.R.,
and Notary Public, State of
Florida at Large.
My Commission No. CC 516581
Expires: December 6, 2007

Pilar A. Stenzel
My Commission DD272286
Expires December 06, 2007

1                    C E R T I F I C A T E                              73

2    THE STATE OF FLORIDA,)
                          )
3    COUNTY OF PALM BEACH.)

4              I, Pilar A. Stenzel, Registered

5    Professional Reporter, certify that the foregoing

6    statement was taken at the time and place

7    hereinabove set forth; that I was authorized to

8    and did stenographically report the foregoing

9    statement, and the transcript is a true and

10   complete record of my stenographic notes.

11

12              DATED this 30th day of May, 2007.

13

14

15              PILAR A. STENZEL, R.P.R.

16

17

18

19

20

21

22

23

24

25

# EXHIBIT E

# *Florida Supreme Court Case Docket*

## Case Number: SC08-252 – Active

## THE FLORIDA BAR  vs.  LAURA L. HESS

### Lower Tribunal Case(s): 2008-90,111(OSC)

06/03/2008 04:24

| Date Docketed | Description | Filed By | Notes |
|---|---|---|---|
| 02/12/2008 | PETITION-ORDER TO SHOW CAUSE | CO The Florida Bar FB BY: CO Kathy Jane Bible 654019 | (W/EXHIBIT) FILED AS "PETITION FOR CONTEMPT AND ORDER TO SHOW CAUSE" |
| 02/18/2008 | No Fee Required | | |
| 02/22/2008 | ORDER-SHOW CAUSE (FLA BAR CONTEMPT) | | The Florida Bar having filed its Petition for Contempt and Order to Show Cause, this is to command you, Laura L. Hess, to show cause on or before March 10, 2008, why you should not be held in contempt of this Court and suspended from the practice of law for ninety-one days and assessed costs in the amount of $1,250.00 for the reasons set forth in The Florida Bar's Petition. The Florida Bar may serve its reply on or before March 20, 2008. |
| 02/28/2008 | ACCEPTANCE OF SERVICE | | RS Laura L. Hess 280940 BY: RS Kevin P. Tynan 710822 FOR OTSC DATED 02/22/08 |
| 03/10/2008 | RESPONSE | RS Laura L. Hess 280940 BY: RS Kevin P. Tynan 710822 | TO OTSC DATED 02/22/08, W/ATTACHMENTS |
| 03/19/2008 | REPLY TO RESPONSE | CO The Florida Bar FB BY: CO Kathy Jane Bible 654019 | TO OTSC DATED 02/22/08, W/ATTACHMENT (O&1) |
| 04/17/2008 | ORDER-REFEREE APPOINTMENT (CONTEMPT PROCDG) | | HON. KATHLEEN J. KROLL, C.J., 15TH JUDICIAL CIRCUIT |
| 04/24/2008 | REFEREE APPOINTED | | DATED 04/21/08, HON. JACK H.COOK, 15TH JUDICIAL CIRCUIT |
| 05/22/2008 | REFEREES REPORT | | W/MISC. PLEADINGS & E-MAIL |

# *Florida Supreme Court Case Docket*

## Case Number:  SC08-509  - Active

### THE FLORIDA BAR  vs.  LAURA L. HESS

**Lower Tribunal Case(s): 2007-50,983(17H), 2007-51,340(17H), 2007-51,482(17H), 2007-51,632 (17H), 2007-51,797(17H), 2007-51,816(17H), 2007-51,866(17H), 2008-50,060(17H), 2008-50,264 (17H), 2008-50,626(17H)**

06/03/2008 04:26

| Date Docketed | Description | Filed By | Notes |
|---|---|---|---|
| 03/14/2008 | COMPLAINT | CO The Florida Bar FB BY: CO Juan Carlos Arias 76414 | W/EXHIBITS (O&1) |
| 03/17/2008 | No Fee Required | | |
| 03/24/2008 | ORDER-REFEREE APPOINTMENT (DISCIPLINARY) | | HON. KATHLEEN J. KROLL, C.J., 15TH JUDICIAL CIRCUIT |
| 03/31/2008 | REFEREE APPOINTED | | DATED 03/27/08, HON. JACK H. COOK, 15TH JUDICIAL CIRCUIT |
| 04/21/2008 | LETTER | CO The Florida Bar FB BY: CO Juan Carlos Arias 76414 | DATED 04/18/08, ADVISING OF ERROR IN LOWER TRIBUNAL NUMBER |

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

CHASE BANK USA, N.A.,                          :
                                               :
    Plaintiff,                            :
                                               :
    v.                                    :
                                               :
HESS KENNEDY CHARTERED, LLC,                   :
LAURA L. HESS, EDWARD T. KENNEDY,              :      Civil Action No. 08-121-JJF
LAURA HESS & ASSOCIATES, P.A.,                 :
HESS KENNEDY HOLDINGS, LTD.,                   :
HESS KENNEDY COMPANY CHARTERED                 :
BWI, THE CONSUMER LAW CENTER, LLC,             :
THE CONSUMER LAW CENTER OF DELRAY              :
BEACH, LLC, THE CONSUMER LAW                   :
CENTER OF BOCA RATON, INC., THE                :
CAMPOS CHARTERED LAW FIRM, JEFF                :
CAMPOS, P.A., JEFFREY S. CAMPOS, LEGAL         :
DEBT CENTER, LLC,                              :
                                               :
    Defendants.                           :

## PROPOSED ORDER

       AND NOW, this _____ day of _____, 2008, upon consideration of

Plaintiff's Motion to Strike Defendants' May 5, 2008 Memorandum, it is hereby ORDERED that

Plaintiff's Motion is GRANTED and Defendants' May 5, 2008 Memorandum is hereby stricken

from the record.  Furthermore, defendants are hereby ORDERED to pay or reimburse Plaintiff

the costs of litigating this motion.

                               BY THE COURT

                               _____

                               Honorable Joseph J. Farnan, Jr.
                               United States District Judge